# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DONALD REITH, individually and on behalf of all others similarly situated,

Plaintiff,

v.

WARREN G. LICHTENSTEIN, GLEN M. KASSAN, WILLIAM T. FEJES, JR., JACK L. HOWARD, JEFFREY J. FENTON, PHILIP E. LENGYEL, JEFFREY S. WALD, STEEL PARTNERS HOLDINGS L.P., STEEL PARTNERS, LTD., SPH GROUP HOLDINGS LLC, HANDY & HARMAN LTD., and WHX CS CORP.,

Defendants,

and

STEEL CONNECT, INC., a Delaware Corporation,

Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2018-0277-MTZ

## MEMORANDUM OPINION

Date Submitted: March 15, 2019
Date Decided: June 28, 2019

Andrew S. Dupre and Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Eduard Korsinksy, Amy Miller, William J. Fields, and Samir Shukurov, LEVI & KORSINSKY, LLP, New York, New York; *Attorneys for Plaintiff Donald Reith.*

John M. Seaman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Thomas J. Fleming, Adrienne Ward, and Kerrin T. Klein, OLSHAN FROME WOLOSKY LLP, New York, New York; *Attorneys for Defendants Warren G. Lichtenstein, Jack L. Howard, Glen M. Kassan, William T. Fejes, Jr., Steel Partners Holdings L.P., Steel Partners, Ltd., SPH Group Holdings LLC, Handy & Harman Ltd., and WHX CS Corp.*

Gregory V. Varallo, Matthew D. Perri, and Sarah T. Andrade, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Jeffrey J. Fenton, Philip E. Lengyel, and Jeffrey S. Wald*.

**ZURN, Vice Chancellor.**

Steel Connect, Inc. acquired another company in December 2017. A Steel Connect stockholder plaintiff sees wrongdoing in part of the deal financing, in which Steel Connect sold preferred stock to Steel Partners Holdings, L.P. ("Steel Holdings"). Steel Holdings already held over a third of Steel Connect's stock, owned the entity responsible for managing Steel Connect, and was affiliated with management and several board members. The newly issued preferred stock pushed Steel Holdings' stock ownership to nearly half. Steel Holdings' component of the financing was considered and approved by a special committee of independent board members, and by the board.

That special committee, and the compensation committee, also recommended equity grants to Steel Connect's executive chairman and two individuals who joined the board the same day Steel Holdings' financing was approved. All three individuals are affiliated with Steel Holdings. Adding these new equity grants to Steel Holdings' existing stock, and the preferred stock it bought, gave Steel Holdings and its affiliates majority control of Steel Connect. Issuing the grants required amending the company's incentive award plan, which in turn required an informed stockholder vote.

The plaintiff views Steel Holdings as a controlling stockholder who owed and breached fiduciary duties by causing Steel Connect to issue Steel Holdings preferred stock, and the equity grants, on the cheap. He claims the directors breached their

fiduciary duties in approving the transaction with Steel Holdings and the equity grants, and by making faulty disclosures in seeking stockholder approval for amending the incentive award plan. On the defendants' motion to dismiss, it appears that Steel Holdings is a controlling stockholder, that the plaintiff's claims are derivative, and that demand for bringing those claims is excused. The stockholder's breach of fiduciary duty claims against these individuals and entities survive the motion to dismiss. I conclude the stockholder has failed to allege the members of the special committee committed a non-exculpated breach of fiduciary duty in approving the preferred stock transaction, but has pled a non-exculpated breach of fiduciary duty for approving the equity grants.

## I. BACKGROUND

I draw the facts from the allegations in, and documents incorporated by reference or integral to, the Complaint and judicially noticeable facts available in public Securities and Exchange Commission filings.[1] Additionally, plaintiff Donald

---

[1] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (providing that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (holding that trial courts may take judicial notice of facts in SEC filings that are "not subject to reasonable dispute"). All citations to the Complaint are to Plaintiff's Verified Stockholder Class Action and Derivative Complaint, Docket Item ("D.I.") 1 ("Compl.").

Reith ("Plaintiff") received books and records from the Company that he used in drafting the Complaint, which are also properly considered on a motion to dismiss.[2]

A. **Steel Holdings Acquires Company Stock, Appoints Directors To The Company's Board, And Influences The Selection Of New Company Executives.**

Defendant Steel Holdings is a Delaware limited partnership and a publicly traded holding company. In 2011, Steel Holdings[3] started acquiring stock in ModusLink Global Solutions, Inc., later renamed Steel Connect, Inc. ("the Company"), which is a Delaware corporation. Steel Holdings owned 14.9% of the Company's outstanding shares by September 28, 2012. In February 2013, Steel Holdings entered into a settlement agreement with the Company that permitted Steel Holdings to appoint directors and purchase additional shares.[4] As part of that agreement, the Company nominated two Steel Holdings designees for election to its

---

[2] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).

[3] Steel Holdings operates through a number of subsidiaries and affiliates, which this opinion often simplifies by referring only to Steel Holdings. Of note, non-party Steel Partners Holdings GP, Inc. ("SHGP") is the general partner of Steel Holdings. Defendant SPH Group Holdings LLC ("SPH") is a subsidiary of SHGP, defendant Handy & Harman Ltd. ("HNH") is wholly owned by SPH, and defendant WHX CS Corp. ("WHX") is wholly owned by HNH. Defendant Steel Partners, Ltd. ("Steel Partners") is an affiliate of Steel Holdings. Each entity beneficially owns shares of Company stock. I refer to Steel Holdings, SPH, HNH, WHX, and Steel Partners together as the "Entity Defendants." When referring collectively to the Entity Defendants and Fejes, Howard, Kassan, and Lichtenstein, I use the term "Steel Holdings Defendants." When referring to the seven individual defendants, I use the term "Director Defendants."

[4] ModusLink Glob. Solutions, Inc., Current Report (Form 8-K) (Feb. 13, 2013).

3

board (defendants Glen M. Kassan and Warren G. Lichtenstein) and agreed that if Lichtenstein were elected, he would serve as chairman; two incumbent directors also retired and were replaced by other new directors. If certain conditions were met, including the election of Steel Holdings' nominees to the board, Steel Holdings would purchase stock and warrants in a private placement. In March 2013, Kassan and Lichtenstein were elected to the board. Accordingly, pursuant to the settlement agreement, the Company sold shares and warrants to Steel Holdings that increased its ownership to 29.9%. From 2013 through 2016, Steel Holdings purchased more Company stock. As of December 14, 2016, Steel Holdings owned 20,440,133 shares of the Company's stock, constituting approximately 35.62% of the Company's outstanding shares.

Lichtenstein is connected to Steel Holdings and its affiliates in a number of ways. He is Executive Chairman of SHGP, which is the general partner of Steel Holdings. He is also CEO of Steel Partners and Chairman of HNH.

Kassan served as the Company's Chief Administrative Officer from May 2014 until January 2015 and has been the board's Vice Chairman since May 2014. He has been associated with Steel Partners LLC, a subsidiary of Steel Holdings, since August 1999. He served as HNH's CEO from October 2005 through December 2012 and on the HNH board until May 2015. He was also an officer and director of SL Industries until its acquisition by HNH in June 2016. Additionally,

4

his principal occupation was "serving as an employee of Steel Services, Ltd." ("Steel Services"), which is a subsidiary of Steel Holdings.[5]

Defendants Jeffrey J. Fenton and Jeffrey S. Wald were already on the Company's board when Kassan and Lichtenstein became directors. Fenton and Wald have no connection to Steel Holdings, and the Company considers them independent directors.

On December 18, 2013, non-party Anthony Bergamo was appointed to the board. "Mr. Bergamo's nomination was recommended by Mr. Lichtenstein, the Company's Chairman of the Board."[6] Although Bergamo was also a director of Steel Holdings, he was classified as an independent director under NASDAQ rules.[7] Bergamo served as a director until his death on September 29, 2017.

Finally, Philip E. Lengyel joined the board in May 2014. Like Fenton and Wald, Lengyel was not affiliated with Steel Holdings, and the Company considers him independent. Bergamo, Fenton, Kassan, Lengyel, Lichtenstein, and Wald were the six members of the Company's board as of August 2017.

Steel Holdings is also involved in managing the Company. On December 31, 2014, an indirect wholly owned subsidiary of Steel Holdings, SP Corporate Services

---

[5] D.I. 28 Ex. 14 at 14.

[6] ModusLink Glob. Solutions, Inc., Definitive Proxy Statement (Schedule 14A), at 10 (Oct. 29, 2013).

[7] D.I. 28 Ex. 15 at 13.

LLC ("SP Corporate"), entered into a Management Services Agreement with the Company.[8] SP Corporate provided management services from January 1, 2015 through March 10, 2016.[9] That day, the Management Services Agreement was amended and SPH Services, Inc., the parent of SP Corporate and an affiliate of Steel Holdings, took over.[10] SP Corporate and Steel Partners LLC then merged into SPH Services, Inc., with SPH Services, Inc. surviving.[11] SPH Services, Inc. has since changed its name to Steel Services Ltd. Lichtenstein was the CEO of SP Corporate Services, and is now the CEO of Steel Services.[12]

Under the management agreement, Steel Services provides "(1) services related to corporate treasury functions and financing matters; (2) services to support M&A functions[;] and (3) services related to advising the Company on risk management, governance and compliance generally, assisting with public company reporting requirements, advising on investigations and litigation, and advising on major business transactions."[13] "During the year ended July 31, 2017, pursuant to the Management Services Agreement, the Company paid a fixed monthly fee of

---

[8] D.I. 28 Ex. 15 at 54.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] D.I. 28 Ex. 11 at 6.

6

$175,000 in consideration for the services and incremental costs as incurred."[14]  This fee was reduced on September 1, 2017, to $95,641 per month.[15]

Steel Holdings affiliates replaced Company management in 2016. Lichtenstein served as the Company's interim CEO from March 28 through June 17, 2016, when he became Executive Chairman.  That day, the Company made two additional personnel changes.  First, James R. Henderson replaced Lichtenstein as CEO of the Company, and also became President.  From March 23 to June 16, 2016, Henderson had served as CEO of the Company's principal operating subsidiary. Henderson's relationship with Steel Holdings goes back to 1999.  "He was associated with [Steel] Partners LLC and its affiliates from August 1999 until 2011."[16]  He was a director of SL Industries from January 2002 to March 2010.  In the early- to mid-2000's, he was a director, CEO, President, COO, and Vice President of Operations at different times for Steel Holdings' predecessor, WebFinancial Corporation.[17]  That included serving as CEO of WebBank, a wholly owned subsidiary of Steel Holdings.

---

[14] *Id*

[15] *Id*.

[16] D.I. 28 Ex. 15 at 57.

[17] *Id*.

Second, the Company hired Louis J. Belardi to serve as Executive Vice President, CFO, and Secretary. Belardi joined the Company from SL Industries, where he had spent approximately the previous twelve years as CFO, Secretary, Treasurer, and Corporate Controller at different times. He replaced Joseph B. Sherk, a Steel Services employee who had served as the Company's Principal Financial Officer, Principal Accounting Officer, and Corporate Controller under the Management Services Agreement from January 1, 2015, through June 27, 2016.[18] In June 2016, when Belardi joined, Sherk went back to working for the Company in a different role.[19]

### B. The Company Finances The IWCO Acquisition With Funding From Steel Holdings, Adds New Directors, And Awards Them Equity Grants.

Plaintiff alleges that in the summer of 2017, Steel Holdings started exploring ways to utilize the Company's net operating loss carryforwards ("NOLs").[20] NOLs

---

[18] *Id*. at 54.

[19] *Id*.

[20] Plaintiff argues, without citation, that Steel Holdings was the driving force behind this strategy. D.I. 50 at 7. The Company highlighted this benefit in announcing the transaction: "Warren Lichtenstein, Executive Chairman of ModusLink, said, 'We have been looking to acquire a profitable business with attractive operations and financials, and with a strong management team in order to leverage our approximately $2.1 billion in net operating loss carryforwards (NOLs) and cash. We found a great fit in IWCO Direct." D.I. 28 Ex. 10 at 1.

can offset income, reducing the taxes a company pays.[21] But because the Company was not profitable, it could not utilize its NOLs. Acquiring another entity that generated profits would allow the Company to unlock the value of the NOLs.

In August 2017, the Company agreed to acquire all outstanding shares of IWCO, a Delaware corporation that provides data-driven marketing solutions. IWCO had consistently generated profits that would allow the Company to take advantage of its NOLs. Plaintiff alleges that Steel Holdings saw the deal as an opportunity to extract economic benefits and seize majority control of the Company without a stockholder vote, and did so through the structure of the deal financing.

The Company's board met on September 8 and discussed financing for the deal. Henderson and Belardi also attended the meeting, along with outside counsel and Defendant Jack L. Howard. At the time, Howard was affiliated with Steel Holdings, but not the Company. The expected deal value was $475.6 million. The board considered a structure that would include financing from affiliates of Cerberus Business Finance LLC, and $83.7 million in cash from the Company in turn financed partially through a "bridge loan" from Steel Holdings. The board resolved to form a special committee of independent directors ("the Special Committee") to consider Steel Holdings' financing, and appointed Wald, Lengyel and Fenton (together the

---

[21] Our Supreme Court has summarized NOLs, how they are used, and how they can be impaired in another case involving a Steel Holdings affiliate. *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 589 (Del. 2010).

9

"Special Committee Defendants"), with Wald as chair, to the Special Committee. The board approved payment of a $25,000 fee to each member of the Special Committee, half payable immediately and half upon closing of the transaction. The Special Committee met for the first time the same day, and minutes reflect that Steel Holdings could "invest up to $35 million in the Company through the purchase of a to-be-established series of the company's convertible preferred stock."[22]

On September 25, the Special Committee met and retained legal and financial advisors.[23] On November 15, the Special Committee met with its financial advisor.[24] The Special Committee reviewed a proposed $35 million capital raise through the issuance of convertible preferred stock ("Preferred Stock").[25]

On December 15, the board met and (1) approved the IWCO acquisition and its funding, (2) added two new members to the board, and (3) awarded equity grants to those new directors and Lichtenstein. The order in which these actions were taken, and which directors approved each act, is disputed. Plaintiff alleged that all seven directors approved the deal and equity grants. The Company disclosed that "[t]he preferred stock transaction was approved by a special committee consisting

---

[22] D.I. 1 ¶ 49.

[23] D.I. 34 Ex. 6.

[24] D.I. 34 Ex. 8.

[25] *Id.*

10

of independent directors of ModusLink who are not affiliated with Steel Partners."[26] At argument, the defendants clarified that the full board approved the deal and equity grants after the Special Committee had approved them.[27] It is not clear whether that version of the full board included the two new directors, and the Company did not include the relevant board minutes in its books and records production to Plaintiff.

Be that as it may, some version of the board approved the deal, and the transaction closed. Under the final terms of the Preferred Stock, the Company created and sold $35,000,000 worth (35,000 shares at $1,000 a share) of Series C Convertible Preferred Stock to SPH, a subsidiary of Steel Holdings. The initial conversion price was $1.96 a share, which represented a 31.5% premium over the December 15, 2017 closing price, of $1.49 per share. The Preferred Stock carried voting rights equal to the number of common shares at the $1.96 conversion price, equaling approximately 11.14% of the Company's voting power. As a result, Steel Holdings' voting power increased from 35.62% to 46.76%. The day the deal was announced, the Company's stock closed at $2.18 per share.

As to the new directors, the Company disclosed that the Nominating Committee[28] of the board had recommended, and the board approved, increasing the

---

[26] D.I. 28 Ex. 10 at 2.

[27] D.I. 92 at 27.

[28] Lengyel and Wald were the members of the Nominating Committee. Bergamo had served on the Committee prior to his death. D.I. 28 Ex. 15 at 15.

11

board to seven seats and electing Howard and William T. Fejes to those seats.[29] Howard is President of Steel Holdings and Steel Holdings GP, and also a director of Steel Holdings GP. Howard is also HNH's Principal Executive Officer and Vice Chairman of its board. Fejes has served as President of non-party Steel Services, an indirect wholly owned subsidiary of Steel Holdings, since October 2017. He has also served as an executive at HNH and at SL Industries, Inc., a subsidiary of HNH.

Finally, the Company further disclosed that the Compensation Committee and Special Committee also recommended, and the board approved, equity grants of 5.5 million shares to Lichtenstein (3.3 million), Howard (1.65 million) and Fejes (550,000) (the "Equity Grants"). Fejes and Howard received these grants for "current and future services to the Company."[30] At argument, their counsel described their role as "*de facto* investment bankers" for the Company, as "[t]hey found the IWCO merger opportunity, went out there and rounded up the financing, did the negotiating and the like."[31]

---

[29] D.I. 28 Ex. 11 at 5-6.

[30] *Id*. at 6.

[31] D.I. 92 at 34. Defendants' counsel stated that the nature of work performed by Fejes and Howard was in the Board's minutes, and may have been in the Company's public disclosures. D.I. 92 at 37. According to Plaintiff, "the Company refused to produce the applicable Board minutes in response to Plaintiff's 220 Demand." D.I. 50 at 40-41. Unlike the September minutes, which were filed as exhibits, the December minutes were not, raising the issue of whether they can be considered on a motion to dismiss.

Four million shares of the Equity Grants were to vest immediately, and the balance (1,500,000) would vest upon the Company's stock price closing at $2.00, $2.25 and $2.50 for five consecutive days. 1,050,000 of the shares were also subject to stockholder approval due to limits set by the Company's Incentive Award Plan adopted in 2010 (the "2010 Plan"). Based on the $2.19 closing price of the Company's stock on December 18, 2017, the Equity Grants to Lichtenstein, Howard, and Fejes were worth approximately $7.2 million, $3.6 million, and $1.2 million, respectively. The Equity Grants gave Steel Holdings' affiliates more than 5% of additional voting power. Through the Equity Grants and Preferred Stock combined, Steel Holdings and its affiliates increased their beneficial ownership from approximately 35.62% to approximately 52.3%.

### C. The Company Seeks Stockholder Approval To Amend Its Compensation Plan.

The Company asked stockholders to approve amendments to the 2010 Plan. The 2010 Plan provided for the grant of various awards, including stock options, restricted stock, and stock appreciation rights. One type of award is a "Full Value Award." Section 2.26 of the Plan defines "Full Value Award" as "any Award other than (i) an Option, (ii) a Stock Appreciation Right or (iii) any other Award for which

the Holder pays the intrinsic value existing as of the date of grant (whether directly or by forgoing a right to receive a payment from the Company or any Affiliate)."[32]

Section 3.1 of the Plan limits the number of Full Value Awards. The parties disagree how it does so. The language is as follows:

> (a) Subject to Section 13.2 and Section 3.1(b), the aggregate number of Shares which may be issued or transferred pursuant to Awards under the Plan is (i) 5,000,000 plus (ii) any Shares which are subject to awards under the Prior Plans which after the Effective Date are forfeited or lapse unexercised or are settled in cash and are not issued under the Prior Plans; provided, that subject to Section 13.2 and, with respect to Full Value Awards that terminate, expire or lapse or for which shares of Common Stock are tendered or withheld, Section 3.1(b) the aggregate number of shares of Common stock which may be issued or transferred pursuant to Full Value Awards under the Plan is 3,000,000. No more than 5,000,000 Shares may be issued upon the exercise of Incentive Stock Options. After the Effective Date, no awards may be granted under any Prior Plan, however, any awards under any Prior Plan that are outstanding as of the Effective Date shall continue to be subject to the terms and conditions of such Prior Plan.[33]

In the Company's Schedule 14A Proxy Statement filed on December 8, 2010 (the "2010 Proxy"), the Company stated that the maximum number of Full Value Awards that could be issued was three million shares: "The Plan provides that no more than 3,000,000 shares will be granted as 'full value awards', such as restricted

---

[32] Compl. ¶ 101.

[33] *Id.* ¶ 102.

stock, restricted stock units, deferred stock, performance awards, or stock payments where the participant does not pay the intrinsic value for such award."[34]

On March 19, 2018, the Company filed its 2017 Proxy. Therein, the Company sought stockholder approval to amend the 2010 Plan to allow for 1,050,000 of the 5,500,000 million in Equity Grants. The proposed amendments (i) increased the number of shares available for issuance from five million to eleven million, and (ii) eliminated the limit on the number of "Full Value Awards" that could be issued under the 2010 Plan (the "Plan Amendment").

In describing the 2010 Plan's terms, the 2017 Proxy did not disclose the limit on Full Value Awards or that the 2010 Proxy described that limit as being set at three million. The 2017 Proxy stated the limit applied not to all Full Value Awards, but only to those issued under the Company's compensation plans prior to the 2010 Plan that were forfeited, lapsed, or settled in cash after the 2010 Plan's effective date, which were recycled for use under the 2010 Plan (the "Recycled Awards"). The board also did not disclose why the Plan Amendment was necessary to effectuate the Equity Grants. The 2017 Proxy told stockholders about the 1,050,000 shares that were subject to the Plan Amendment, but did not reiterate the previously disclosed details of all of the Equity Grants.

---

[34] *Id.* ¶ 103.

## D.    Litigation Ensues.

On January 23, 2018, Plaintiff sent the Company a demand pursuant to 8 *Del. C.* § 220 for books and records concerning the issuance of the Preferred Stock and the Equity Grants (the "Challenged Transactions").   After agreeing to a confidentiality agreement that provided that the Company's production would be deemed incorporated in a subsequent complaint, Plaintiff received documents. Plaintiff then filed his six-count complaint on April 13, 2018.  In short, Plaintiff alleges that (1) the Challenged Transactions were a pretext for allowing Steel Holdings to gain majority voting control for inadequate consideration, and (2) the Director Defendants misled stockholders in seeking their approval for the Equity Grants.   Accordingly, Plaintiff argues the individual directors breached their fiduciary duties in approving and disclosing the Challenged Transactions, and violating the 2010 Plan through the Equity Awards (Counts I (direct) and II (derivative)); that the Entity Defendants aided and abetted those breaches (Counts III (direct) and IV (derivative)); that Steel Holdings as the Company's controlling stockholder breached its fiduciary duties (Count V); and that the recipients of the Preferred Stock and Equity Grants were unjustly enriched (Count VI).

On June 8, 2018, the defendants moved to dismiss under Court of Chancery Rule 12(b)(6) and Rule 23.1.  The parties briefed the motions, and I heard oral

argument on March 5, 2019. Of their own volition, the parties submitted supplemental letters on March 8 and 15.

## II.    ANALYSIS

The defendants' motions to dismiss under Rules 12(b)(6) and 23.1 and is made more complex by the fact that the board went through several iterations. The Steel Holdings Defendants provided the following chart summarizing the composition of the board during the relevant periods:

| August 2017 | December 15, 2017[35] | Present |
|---|---|---|
| Lichtenstein (Chair) | Lichtenstein (Chair) | Lichtenstein (Chair) |
| Kassan | Kassan | Kassan |
| Wald | Wald | Wald |
| Fenton | Fenton | Fenton |
| Lengyel | Lengyel | Lengyel |
| Bergamo (to Sept. 29, 2017) | | Howard |
| | | Fejes |

I first address whether Steel Holdings was a controlling stockholder at the time of the Challenged Transactions. That analysis informs whether Plaintiff's claims are dual, not just derivative, and whether Plaintiff's claims are reviewed under the business judgment rule or entire fairness. After concluding Steel Holdings is a controller and Plaintiff's claims are derivative, I turn to whether demand is excused. Finding that it is, I turn to whether the members of the Special Committee

---

[35] As explained earlier, Fejes and Howard joined the board at some point on December 15, 2017. This column represents the Board before it met and added new members that day.

are exculpated. I then consider Plaintiff's claims for aiding and abetting. Finally, under Rule 12(b)(6), I consider whether Plaintiff has adequately pled his derivative breach of fiduciary duty, unjust enrichment, and disclosure claims.

## A. Standard of Review

Rules 12(b)(6) and 23.1 place different pleading burdens on the parties. "Rule 23.1 places a heightened burden on Plaintiff to plead demand futility by meeting 'stringent requirements of factual particularity that differ substantially from the permissive notice pleadings'" of Rules 8 and 12(b)(6).[36] "Because the standard under Rule 12(b)(6) is less stringent than that under Rule 23.1, a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim."[37]

Under the reasonable conceivability standard of Rule 12(b)(6), I must "accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set

---

[36] *Tilden v. Cunningham*, 2018 WL 5307706, at *9 (Del. Ch. Oct. 26, 2018) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

[37] *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008).

of circumstances susceptible of proof."[38]   And "[a]lthough there is a heightened burden under Rule 23.1 to plead particularized facts, when a motion to dismiss for failure to make a demand is made, all reasonable inferences from the pled facts must nonetheless be drawn in favor of the plaintiff in determining whether the plaintiff has met its burden under *Aronson*."[39]

### B.   Steel Holdings Is A Controlling Stockholder.

The allegation that a transaction involves a controlling stockholder on both sides is a serious one because it imposes fiduciary duties on the controlling stockholder and potentially strips directors of the protection of the deferential business judgment rule.  "If the plaintiff rebuts the business judgment presumption, the Court applies the entire fairness standard of review to the challenged action and places the burden on the directors to prove that the action was entirely fair."[40]  This usually precludes granting a motion to dismiss.[41]

---

[38] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[39] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015); *see also Marchand v. Barnhill*, --- A.3d ---, 2019 WL 2509617, at *10 (Del. June 18, 2019) ("The standard for conducting this inquiry at the demand futility stage is well balanced, requiring that the plaintiff plead facts with particularity, but also requiring that this Court draw all reasonable inferences in the plaintiff's favor.")

[40] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 36-37 (Del. Ch. 2010).

[41] *See Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014) ("[T]he possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged

"In 1994, in the seminal case of *Kahn v. Lynch Communications Systems, Inc.*[], the Delaware Supreme Court described two scenarios in which a stockholder could be found a controller under Delaware law: where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'"[42] A plaintiff may plead that a minority stockholder exercises control over the business affairs of the corporation even if only "with regard to the particular transaction that is being challenged."[43] Before the Challenged Transactions, Steel Holdings owned 35.62% of the Company's shares, so the parties appropriately focus on the second scenario.

The "'actual control' test requires the court to undertake an analysis of whether, despite owning a minority of shares, the alleged controller wields 'such formidable voting and managerial power that, as a practical matter, it is no differently situated than if it had majority voting control.'"[44] "Making this showing is no easy task, as the minority blockholder's power must be so potent that it triggers

---

transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it.").

[42] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994)), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[43] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006).

[44] *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016) (quoting *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013)).

the traditional *Lynch* concern that independent directors' free exercise of judgment has been compromised."[45]  "[T]he scatter-plot nature of the [Court's previous] holdings highlights the importance and fact-intensive nature of the actual control factor."[46]  But at bottom, the plaintiff must show only that it is reasonably conceivable the minority stockholder is a controller.[47]

Finally, a note about timing.  This Court has not often had to identify the precise moment when a stockholder assumed or wielded control, or decide whether a change in board composition caused a controller to lose control.  In this case, the parties select a time that helps their arguments when taking Bergamo's September 29, 2017 passing into account.  Defendants argue the relevant time is when the Special Committee approved the Challenged Transactions on December 15.[48]  Plaintiff argues Steel Holdings was a controller throughout all relevant time periods,

---

[45] *Larkin*, 2016 WL 4485447, at *13.

[46] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014).

[47] *Id*. at *8; *see also In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018) (applying reasonable conceivability test to controlling stockholder analysis).

[48] D.I. 92 at 6.  Defendants cited *Carr v. New Enterprise Associates, Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018), which dealt with the different question of whether there was an alleged controller before a transaction at all, not when to evaluate the party's control in light of changes to the stockholder's power during the relevant time period.

but suggests that if the Court must select one time to evaluate the transaction, that moment should be September 8, 2017, when the Special Committee was created.[49]

The Delaware Supreme Court's recent decision in *Olenik v. Lodzinski*[50] provides guidance. There, in deciding whether a majority stockholder who fell below 50% ownership during the negotiating period remained a controlling stockholder, the Supreme Court concluded the analysis should focus on when "substantive economic negotiations took place that fixed the field of play for the eventual transaction price."[51] Here, the key economic negotiations started at least in early September, when the board created the Special Committee and started negotiating the terms of the Preferred Stock. Still, because context matters, this opinion analyzes Steel Holdings' influence throughout the relevant period, including how it changed over time.

### 1. Steel Holdings Controlled The Company As Of August 2017.

Plaintiff focuses on three aspects of Steel Holdings' influence over the Company. The first is its stock ownership of 35.62%. The second is Steel Holdings' ability to appoint Company directors. The third is its control over the Company's management. Steel Holdings replaced the Company's management with alleged

---

[49] D.I. 92 at 72.

[50] --- A.3d ---, 2019 WL 1497167 (Del. Apr. 5, 2019).

[51] *Id.* at *10.

affiliates in June 2016, and the Company paid an affiliated entity significant funds every month under the Management Services Agreement. Together, these sources of influence make it reasonably conceivable Steel Holdings was a controlling stockholder entering August 2017.

First, the 35.62% stake in the Company is not enough on its own,[52] but it is "a large enough block of stock to be the dominant force in any contested election."[53] Indeed, Steel Holdings used its stock purchases to secure a settlement agreement that allowed it to purchase additional shares and obtain clout over the board: in early 2013 it replaced two of the five incumbents, and increased the board to seven by adding Lichtenstein and Kassan. Later that year, Lichtenstein successfully recommended that Bergamo, also a director at Steel Holdings, join the board. Defendants concede Lichtenstein is not independent of Steel Holdings. Plaintiff has alleged extensive connections between Kassan and Steel Holdings that, for reasons explained below in the context of demand futility, also impair his ability to act independently of Steel Holdings.

---

[52] *Compare In re Rouse Props., Inc.*, 2018 WL 1226015, at *18 (Del. Ch. Mar. 9, 2018) ("Brookfield's 33.5% ownership stake in Rouse is not impressive on its own."), *and In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) (describing a 33.5% ownership group as "an overall level of ownership that is relatively low" and would require "additional facts supplementing [the stockholder's] clout"), *with In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 551 (Del. Ch. 2003) (group of stockholders controlling "about 40% of the voting equity" deemed to be controlling stockholders given influence over management).

[53] *Cysive*, 836 A.2d at 551-52.

Lastly, the parties dispute Bergamo's independence.[54] That is not the question that informs whether Steel Holdings is a controlling stockholder.[55] "Lack of independence focuses on the director, and whether she has a conflict in the exercise of her duty on behalf of her corporation. Consideration of controller status focuses on the alleged controller, and whether it effectively controls the board of directors so that it also controls disposition of the interests of the unaffiliated stockholders."[56] In considering Steel Holdings' control at the Company, what matters is its ability to control who joined the board. The Company's disclosure on this point is clear: "Mr.

---

[54] The Company's 2016 10-K stated, "[m]embers of our Board of Directors also have significant interests in Steel Partners and its affiliates, which may create conflicts of interest." ModusLink Glob. Solutions, Inc., Annual Report (Form 10-K) at 14 (Oct. 14, 2016). It listed the relationships that Lichtenstein and Kassan had with Steel Holdings, and said "Anthony Bergamo, a director, is also a director of Steel Partners." *Id.* It closed with: "As a result, these individuals may face potential conflicts of interest with each other and with our stockholders. They may be presented with situations in their capacity as our directors that conflict with their fiduciary obligations to Steel Partners and its affiliates, which in turn may have interests that conflict with the interests of our other stockholders." *Id.* Defendants overlook that as to the Preferred Stock, Bergamo was "a classic dual fiduciary, with duties to both sides in the Transaction." *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016).

[55] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *18 (Del. Ch. May 31, 2017) ("Whether or not this is a sufficient pleading to imply lack of director independence, it is not sufficient, if true, to show that [the alleged controller] exercised actual control over the Board.").

[56] *Sciabacucchi*, 2017 WL 2352152, at *17.

24

Bergamo's nomination was recommended by Mr. Lichtenstein, the Company's Chairman of the Board."[57]

Finally, Steel Holdings increasingly influenced management. It signed the Management Services Agreement whereby the Company paid a Steel Holdings affiliate to provide services. And the Company's top executives were also Steel Holdings affiliates: Lichtenstein acted as interim CEO until Henderson and Balardi, who also have connections to Steel Holdings, took the executive positions of CEO and CFO in 2016. In the period before the IWCO transaction, Howard and Fejes acted as "*de facto* investment bankers" for the Company, as "[t]hey found the IWCO merger opportunity, went out there and rounded up the financing, did the negotiating and the like."[58] This hands-on work further supports the conclusion that Steel Holdings had "day-to-day managerial supremacy" over the Company as of August 2017.[59]

The gestalt of Steel Holdings' stock ownership, influence over the board, and influence over management makes it reasonably conceivable that it exercised control over the Company's business affairs entering August 2017, when the Company began negotiating the IWCO acquisition, such that it owed fiduciary duties.

---

[57] ModusLink Glob. Solutions, Inc., Definitive Proxy Statement (Schedule 14A) at 10 (Oct. 29, 2013).

[58] D.I. 92 at 34.

[59] *Cysive*, 836 A.2d at 552.

## 2. Steel Holdings Appears To Exercise Control Leading Up To The Challenged Transactions And Over Their Approval.

On September 8, 2017, the board met to consider the deal to acquire IWCO and its financing, and appointed the Special Committee to review Steel Holdings' financing component. On September 29, as the Company was moving forward with the transaction, Bergamo passed away. Thus, as of September 29, three of the Company's five directors were independent and unaffiliated with Steel Holdings. Based only on that fact, especially in light of Plaintiff's insistence that Bergamo was not independent from Steel Holdings, Steel Holdings' influence would appear to decrease leading up to the approval of the Challenged Transactions. But other data points show the opposite.

First, Steel Holdings affiliates were involved in the IWCO transaction. Howard, a Steel Holdings affiliate and eventual board nominee, attended the September 8 board meeting. At that time, Howard had no position at the Company. His only connection was to Steel Holdings. The minutes from that meeting show the board only discussed two topics: (1) whether the board should appoint a Special Committee, and (2) management's update as to ongoing Company operations.[60]

Second, the Company gave Howard and Fejes stock options worth $3.6 million and $1.2 million when they joined the board in December 2017 for "current

_____

[60] D.I. 34 Ex. 5.

26

and future services to the Company,"[61] apparently in the form of facilitating the IWCO transaction as described above. The fact that the Company compensated two Steel Holdings individuals for arranging the IWCO transaction supports the conclusion that Steel Holdings controlled that transaction.

Finally, Fejes and Howard joined the board on the same day the board approved the IWCO transaction. As when Lichtenstein, Kassan, and Bergamo joined the board, the December additions indicate Steel Holdings had control over who joined the board.[62] Whether Fejes and Howard joined the board before or after it approved the Challenged Transactions, and whether they participated in the vote, remain to be seen. According to the Steel Holdings Defendants' briefing, the Special Committee approved the Challenged Transactions "at a time when the independents were a majority (three of five) of the board."[63] At argument, the Steel Holdings Defendants clarified that the full board approved the Challenged Transactions after the Special Committee had approved them.[64] Plaintiff alleges all seven board

---

[61] D.I. 28 Ex. 11 at 6.

[62] *See Sciabacucchi*, 2017 WL 2352152, at *17 ("Consideration of controller status focuses on the alleged controller, and whether it effectively controls the board of directors so that it also controls disposition of the interests of the unaffiliated stockholders.").

[63] D.I. 28 at 2; *see also id*. at 27 ("Plaintiff also cannot state any claim with respect to the Preferred Stock transaction as it was approved by the Special Committee at a time when independent directors constituted the majority of Board members."); *id*. at 39 (same with respect to Equity Grants).

[64] D.I. 92 at 27.

members, including Fejes and Howard, approved the Challenged Transactions.[65] Plaintiff also points out that under the 2010 Plan, awards such as the Equity Grants could only be given to employees, consultants, or non-employee directors, so Fejes and Howard must have been directors on the day the transactions were approved to receive their grants. Thus, it is reasonably conceivable that Fejes and Howard were on the version of the board that approved the Challenged Transactions.[66] Under those facts, and as further discussed below in the context of demand futility, a majority of the directors were not disinterested and independent when the board approved the Challenged Transactions.

Thus, even if control is analyzed as of December 2017, when the board approved the Challenged Transactions, it is reasonably conceivable that Steel Holdings was a controlling stockholder, and that it exercised actual control over the Company for purposes of the IWCO acquisition.

---

[65] Compl. ¶ 155-56.

[66] This conclusion also precludes dismissal of Plaintiff's claims against and Fejes and Howard. Plaintiff alleges all of the Director Defendants approved the IWCO transaction, including the Preferred Stock, and that Fejes and Howard breached their fiduciary duties by knowingly accepting stock grants in violation of the 2010 Plan. *Id*. ¶¶ 163-64. Fejes and Howard initially made a simple argument to support dismissal: they were not on the board that approved the Challenged Transactions and therefore could not owe fiduciary duties. D.I. 28 at 23. But, in the context of Defendants' concession that the full board approved the transaction, Plaintiff has sufficiently alleged that Fejes and Howard were fiduciaries at the time of the Challenged Transaction.

28

### C. Plaintiff's Claims Are Solely Derivative, And The *Gentile* Exception Does Not Apply.

Plaintiff alleges both direct (Counts I, III, V) and derivative claims (Counts II, IV, VI) asserting the board and Entity Defendants breached their fiduciary duties in approving the Challenged Transactions.[67] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* governs whether a claim is direct or derivative.[68] The inquiry "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[69] "[A] court should look to the nature of the wrong and to whom the relief should go."[70] "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[71] By contrast, a stockholder pleads a direct claim if he "demonstrate[s] that the duty

---

[67] Plaintiff also alleges the Director Defendants breached their duty of candor in seeking stockholder approval to amend the 2010 Plan to allow parts of the Equity Grants. This is well pled as a direct claim and is addressed below.

[68] 845 A.2d 1031 (Del. 2004).

[69] *Id.* at 1033.

[70] *Id.* at 1039.

[71] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[72]

Appropriately, Plaintiff does not argue his claims are direct under *Tooley*. "In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock."[73] In such situations, "any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction."[74]

Plaintiff instead argues "[t]he Preferred Stock and Equity Grants fall squarely within the unique circumstances that give rise to dual-natured claims espoused by the Delaware Supreme Court in" *Gentile v. Rossette*.[75] In *Gentile*, our Supreme Court stated that there "is at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character."[76] Claims are treated as "both derivative and direct" if:

---

[72] *Tooley*, 845 A.2d at 1039.

[73] *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006).

[74] *Id.*

[75] D.I. 50 at 37.

[76] 906 A.2d at 99.

(1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[77]

In *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, the Supreme Court indicated that *Gentile* should be applied cautiously, and "decline[d] the invitation to further expand the universe of claims that can be asserted" dually.[78] Chief Justice Strine concurred and went further, describing *Gentile* as "difficult to reconcile with traditional doctrine" and viewing the Supreme Court's refusal "to extend *Gentile* to the alternative entity arena" as "implicitly recogniz[ing] that *Gentile* undercuts the clarity and coherence that *Tooley* brought to the determination of what claims are derivative."[79]

---

[77] *Id*. at 100.

[78] 152 A.3d 1248, 1264 (Del. 2016).

[79] *Id*. at 1266.

Since *El Paso*, this Court has handled *Gentile* claims carefully.[80] One of those decisions, *Klein v. H.I.G. Capital, L.L.C.*, guides the analysis in this case.[81] *Klein* also dealt with the issuance of preferred stock. The alleged controlling stockholder there purchased $310 million worth of Series A preferred stock from the corporation.[82] "[T]he gravamen of the Complaint [was] that [the alleged controller] paid less than fair value to the Company to acquire the Preferred Stock."[83] That claim was "a classic form of an 'overpayment' claim" because it challenged "the fairness of the consideration paid for the Preferred Stock given its terms."[84]

---

[80] *See Sheldon v. Pinto Tech. Ventures, L.P.*, 2019 WL 336985, at *11 (Del. Ch. Jan. 25, 2019) ("declin[ing] to extend *Gentile* as *Carsanaro* and *Nine Systems* did"); *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *7 (Del. Ch. Dec. 19, 2018) (noting "this court has exercised caution in applying the *Gentile* framework"); *Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *24 (Del. Ch. Aug. 17, 2018) (noting the Supreme Court in *El Paso* "recently construed the [*Gentile*] doctrine narrowly" and that "[i]n the wake of *El Paso*, this court has exercised caution in applying the *Gentile* framework"); *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018) ("In my view, the reasoning of *El Paso*, applied here, means that *Gentile* must be limited to its facts, which involved a dilutive stock issuance to a controlling stockholder.").

[81] 2018 WL 6719717. *Klein* was issued after briefing on the motions occurred in this case and discussed with counsel at argument. D.I. 92 at 81-82.

[82] 2018 WL 6719717 at *3. The many transactions there were interrelated and interdependent, which complicated the analysis of when the entity receiving the preferred stock became a controlling stockholder. Chancellor Bouchard "assume[d] for the sake of argument" that the entity had acquired the common shares and control before acquiring the preferred stock. *Id*. at *8.

[83] *Id*. at *5.

[84] *Id*. at *6.

Chancellor Bouchard concluded *Gentile* did not apply to the issuance of the preferred stock, "particularly in light of the Supreme Court's recent *El Paso* decision."[85] Even though the preferred stock "would have resulted in a dilution of the minority stockholders' voting power," "the critical point" was that the minority stockholders were not diluted in the same way as those in *Gentile* "because they retained the same percentage of the Company's shares of common stock after the Preferred Stock was issued as they had before."[86] The harm came not from dilution, but from the "issuance of a different type of security (the Preferred Stock) whose terms allegedly should have commanded a higher price than was paid."[87] "The benefit of any recovery to remedy this alleged harm logically would go to the Company rather than any specific stockholder(s) and thus the underlying legal theory is plainly derivative in nature."[88]

In this case, the allegations about the Preferred Stock are nearly identical and so warrant the same conclusion as *Klein*. Because *Gentile* does not apply here, Plaintiff's claims concerning the Preferred Stock are properly analyzed as derivative.

---

[85] *Id*. at *8.

[86] *Id*.

[87] *Id*. at *9.

[88] *Id*.

The same is true for the approval of the Equity Grants. It is not clear that the Grants even satisfy the first prong of *Gentile* because there is no exchange of shares for assets of the controlling stockholder that have a lesser value. The Equity Grants were for "current and future services to the Company."[89] Lawsuits challenging such "excessive payments of corporate funds" are also traditionally derivative,[90] as under *Tooley* any loss was experienced by, and any recovery would go to, the corporation.[91] The claim is derivative, and in light of *El Paso*, I will not extend *Gentile* to the Equity Grants. Plaintiff's direct claims of breach of fiduciary duty in Counts I and V are dismissed.

## D. Demand Is Excused.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the

---

[89] D.I. 28 Ex. 11 at 6.

[90] *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988); *see also Feldman*, 951 A.2d at 735 (challenge to stock options derivative); *Calma v. Templeton*, 114 A.3d 563, 574 (Del. Ch. 2015) (analyzing demand futility for derivative claims related to compensation awards to directors).

[91] The same conclusion is warranted for Count V, which Plaintiff pled as a direct claim against Steel Holdings as a controlling stockholder. "*Tooley* requires this Court to look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged." *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *9 (Del. Ch. June 25, 2018). As described above, if Steel Holdings benefitted from the Challenged Transactions at the Company's expense, then it was the Company that was harmed, and the Company that would get any recovery. *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56 (Del. Ch. 2015) (describing "straightforward examples of derivative claims" arising from contract between controlling stockholder and corporation). The claim is thus derivative and belongs to the Company.

34

corporation."[92]  This applies to "[t]he decision whether to initiate or pursue a lawsuit

on behalf of the corporation."[93]  "Recognizing, however, that directors and officers

of a corporation may not hold themselves accountable to the corporation for their

own wrongdoing, courts of equity have created an ingenious device to police the

activities of corporate fiduciaries:  the shareholder's derivative suit."[94]  Because a

derivative action "impinges on the managerial freedom of directors" to control that

litigation, the Court conducts a threshold inquiry to determine whether the derivative

action is appropriate.[95]  "Accordingly, in order to cause the corporation to pursue

---

[92] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)).  As Vice Chancellor Laster has explained, "[a]lthough the technical rules of legal citation would require noting that [*Aronson*] was reversed on other grounds by *Brehm*," that "creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon" set forth in *Aronson* that remain good law.  *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 197814, at *5 (Del. Ch. Jan. 15, 2016).  This opinion therefore also "omit[s] the cumbersome subsequent history" in citing *Aronson*.  *Id*. at *5 n.2.

[93] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009); *see also South v. Baker*, 62 A.3d 1, 13 (Del. Ch. 2012) ("When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved.").

[94] *Agostino v. Hicks*, 845 A.2d 1110, 1116 (Del. Ch. 2004); *see also Aronson*, 473 A.2d at 811 ("The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it.").

[95] *Aronson*, 473 A.2d at 812; *see also Desimone v. Barrows*, 924 A.2d 908, 914 (Del. Ch. 2007) (describing issue as whether "board should be divested of its authority to address that misconduct"); *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988) ("Because the shareholders' ability to institute an action on behalf of the corporation inherently impinges upon the directors' power to manage the affairs of the corporation the law imposes certain prerequisites on a stockholder's right to sue derivatively.").

litigation, a [stockholder] must either (1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile."[96]

The demand requirement "insure[s] that a stockholder exhausts his intracorporate remedies,"[97] "provide[s] a safeguard against strike suits,"[98] and "assure[s] that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur."[99] "[T]he demand requirement and the strict requirements of factual particularity under Rule 23.1 'exist to preserve the primacy of board decisionmaking regarding legal claims belonging to the corporation.'"[100] Any attempt to plead demand futility "must comply with stringent requirements of factual particularity" required by Rule 23.1, which are "not satisfied by conclusory statements or mere notice pleading."[101]

Plaintiff did not make a demand before bringing his derivative claims (Counts II, IV, and VI), and alleges doing so would have been futile. "Under Delaware law,

---

[96] *Citigroup*, 964 A.2d at 120.

[97] *Aronson*, 473 A.2d at 811.

[98] *Id.* at 812.

[99] *Kaplan*, 540 A.2d at 730.

[100] *Citigroup*, 964 A.2d at 120 (quoting *Am. Int'l Group, Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 808 (Del. Ch. 2009)).

[101] *Brehm*, 746 A.2d at 254.

depending on the factual scenario, there are two different tests for determining whether demand may be excused: the *Aronson* test and the *Rales* test."[102] This Court has discussed the differences between those tests (or lack thereof) at length in other decisions.[103] Here, the parties agree *Aronson* applies.[104] "Under the familiar *Aronson* test, to show demand futility, plaintiffs must provide particularized factual allegations that raise a reasonable doubt that '(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'"[105]

---

[102] *Feuer v. Redstone*, 2018 WL 1870074, at *8 (Del. Ch. Apr. 19, 2018); *see generally Rales v. Blasband*, 634 A.2d 927 (Del. 1993).

[103] *See, e.g., Park Empls. & Ret. Bd. Empls. Annuity & Benefit Fund of Chicago v. Smith*, 2017 WL 1382597, at *5 (Del. Ch. Apr. 18, 2017) ("The analyses in both *Rales* and *Aronson* drive at the same point; they seek to assess whether the individual directors of the board are capable of exercising their business judgment on behalf of the corporation."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013) (explaining the *Aronson* and *Rales* tests are "complementary versions of the same inquiry"); *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003) (stating "the differences between the *Rales* and the *Aronson* tests in the circumstances of this case are only subtly different, because the policy justification for each test points the court toward a similar analysis").

[104] Defendants initially argued *Rales* applied because only the Special Committee, and not the full board, approved the Challenged Transactions. D.I. 28 at 29. At oral argument, Defendants informed the Court that after further review, they agreed with Plaintiff that *Aronson* applies because the full board (of either five or seven) approved the Challenged Transactions. D.I. 92 at 27.

[105] *Citigroup*, 964 A.2d at 120 (quoting *Brehm*, 746 A.2d at 253).

"[D]emand futility analysis is conducted on a claim-by-claim basis."[106] I turn first to Plaintiff's claim that the board breached their fiduciary duties in approving the Preferred Stock, and then to the Equity Grants.

### 1. Demand Is Excused Concerning The Preferred Stock.

Plaintiff focused his arguments that demand is excused on the disinterestedness and independence of the board.[107] "At the pleading stage, a lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'"[108] "Independence is a fact-specific

---

[106] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014); *see also Baiera*, 119 A.3d at 67 (Del. Ch. 2015) (stating "neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry").

[107] At argument, Plaintiff touched briefly upon the second *Aronson* prong as to the substance of the Preferred Stock. D.I. 92 at 74. This argument was not briefed, and alleged in conclusory fashion in the Complaint. Compl. ¶¶ 120, 144. Plaintiff did not meet the high burden of satisfying this prong. *See Kahn v. Tremont Corp.*, 1994 WL 162613, at *6 (Del. Ch. Apr. 21, 1994) ("The second prong of *Aronson* is, I suppose, directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review. The test for [establishing demand futility on this ground] is thus necessarily high, similar to the legal test for waste.").

[108] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Sanchez*, 124 A.3d at 1023 n.25); *see also Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) ("the independence inquiry requires us to determine whether there is a reasonable doubt that any one of these three directors is capable of objectively making a business decision to assert or not assert a corporate claim").

determination made in the context of a particular case. The court must make that determination by answering the inquiries:  independent from whom and independent for what purpose?"[109]  Here, the inquiry is whether each director is independent from Steel Holdings for the purpose of evaluating a demand relating to the Preferred Stock.

Defendants have conceded that Lichtenstein, Howard, and Fejes were not independent and disinterested with respect to either the Preferred Stock or the Equity Grants.[110]  This gives Plaintiff three of the four directors he must compromise to show demand would have been futile.

Fenton, Lengyel, and Wald are the three members of the Special Committee. Plaintiff asserts only a conclusory challenge to their independence and disinterestedness.  Plaintiff alleges that "they face a substantial likelihood of liability for having improperly approved" the Challenged Transactions.[111]  But "the fact that a director previously approved a challenged transaction is one of many factors that 'standing alone' or 'without more' will not call into question a director's ability to consider a demand."[112]  Nor is it enough that the members of the Special Committee

---

[109] *Beam*, 845 A.2d at 1049-50.

[110] D.I. 28 at 30; D.I. 58 at 14-19; D.I. 92 at 26-27.

[111] D.I. 50 at 51; Compl ¶ 143.

[112] *EZCORP*, 2016 WL 301245, at *39; *see also Aronson,* 473 A.2d at 817 ("mere directorial approval of a transaction, absent particularized facts supporting a breach of

received a $25,000 fee for their services. Plaintiff has not shown that was a material amount.[113] Plaintiff has not raised a reasonable doubt about these directors' independence.

That leaves Kassan, the seventh and final director, as the director that will tip the scales for demand futility. Kassan's connections to Steel Holdings, apart from his roles at the Company, date back to 1999 and are set forth in the following chart.

| **Steel Holdings Affiliate** | **Position(s)** | |
|---|---|---|
| Steel Services | Employee | Current |
| HNH | CEO | Oct. 2005 – Dec. 2012 |
| | Vice Chairman of Board of Directors | Oct. 2005 – May 2015 |
| | Member of Board of Directors | July 2005 – May 2015 |
| SL Industries | Member of Board of Directors | Jan. 2002 – June 2016 |
| | President | Feb. 2002 – Aug. 2005 |
| | Chairman of Board of Directors | May 2008 – June 2016 |
| | Interim CEO | June 14-29, 2010 |
| | Interim CFO | June 14 – Aug. 30, 2010 |
| WebFinancial Corporation (predecessor to Steel Holdings) | Vice President | June 2000 – Apr. 2007 |
| | CFO | June 2000 – Apr. 2007 |
| | Secretary | June 2000 – Apr. 2007 |

fiduciary duty claim, or otherwise establishing the lack of independence or disinterestedness of a majority of the directors, is insufficient to excuse demand").

[113] *See Parnes v. Bally Entm't Corp.*, 2001 WL 224774, at *9 (Del. Ch. Feb. 23, 2001) (stating there was no evidence "that the $50,000 fee was enough to constitute a material interest to any of the" directors), *aff'd*, 788 A.2d 131 (Del. 2001).

At the Company, Kassan was one of the first directors Steel Holdings nominated to the board in 2013 under the settlement agreement. He became Vice Chairman of the Company's board in May 2014, and served as Chief Administrative Officer between May 2014 and January 2015. He is considered "a member of the Section 13(d) group"[114] along with Lichtenstein, Howard, and Fejes, HNH, and numerous other Steel Holdings affiliates.[115] The Company has disclosed that he is "affiliated with Steel Holdings,"[116] and warned he may face conflicts of interest with Steel Holdings.[117] He was not an independent director under NASDAQ rules. As of December 2017, Kassan's "principal occupation" was "serving as an employee of Steel Services, Ltd., a subsidiary of Steel Holdings." [118]

The parties dispute Kassan's recent history with Steel Holdings. Plaintiff's Complaint alleges Kassan's recent roles to be only his seat on the board, his role with SL Industries that ended in June 2016, and his continued employment by Steel

---

[114] D.I. 28 Ex. 15 at 52.

[115] *See generally* D.I. 28 Ex. 14.

[116] D.I. 28 Ex. 15 at 53 & 54.

[117] ModusLink Glob. Solutions, Inc., Annual Report (Form 10-K) at 14 (Oct. 14, 2016). ("Members of our Board of Directors also have significant interests in Steel Partners and its affiliates, which may create conflicts of interest. . . . As a result, these individuals may face potential conflicts of interest with each other and with our stockholders. They may be presented with situations in their capacity as our directors that conflict with their fiduciary obligations to Steel Partners and its affiliates, which in turn may have interests that conflict with the interests of our other stockholders.").

[118] D.I. 28 Ex. 14 at 14.

41

Services. At argument, defendants argued Kassan was "semiretired," that his connections to Steel Holdings varied in duration but generally ended in 2016, and that Plaintiff did not allege "he is someone who is now drawing significant amounts of his livelihood from" Steel Holdings.[119] This led to competing letters after argument.[120] Plaintiff points out that the Schedule 13D filed on March 7, 2019, reiterated the previously disclosed facts that Kassan is "an employee of a subsidiary of Steel Holdings" and that his "principal occupation" was still "serving as an employee of Steel Services, Ltd., a subsidiary of Steel Holdings."[121] The Steel Holdings Defendants responded that Kassan left "full-time employment in 2015" and since that time

> his responsibilities at Steel Services, Ltd., have involved responding to requests from the companies with which he had served in the past, and providing information and insights drawing on his experience. He is paid the minimum necessary to enable him to participate in Steel Services' medical plan: $23,659.92 gross pay in 2018.[122]

This information was not in the record or the Company's public filings.

For purposes of defendants' motion to dismiss, even under Rule 23.1, Plaintiff is entitled to all reasonable inferences from facts that are pled or subject to judicial

---

[119] D.I. 92 at 21.

[120] D.I. 90 & 91.

[121] D.I. 90 Ex. A at 15.

[122] D.I. 91 at 5.

notice. On those facts, Plaintiff has sufficiently alleged that Kassan would not be disinterested and independent in evaluating a demand concerning the Preferred Stock. As listed above, Kassan has had numerous roles, including roles such as CEO, President, and CFO that warrant significant compensation, for four entities within the Steel Holdings family. According to public disclosures, as of both December 2017 and March 2019, his "principal occupation" was working for Steel Services, which is the Steel Holdings affiliate that provides the Company services under the Management Services Agreement.

The Preferred Stock increased Steel Holdings' ownership in the Company. The nature and number of roles Kassan has had with Steel Holdings and its affiliates, and the length of his service, create a reasonable doubt as to his independence for evaluating whether to pursue claims related to the Preferred Stock. As a result, the scales tip in Plaintiff's favor. Demand was futile, and so excused, for the claims challenging the issuance of the Preferred Stock.

### 2. Demand Is Excused Concerning The Equity Grants.

To Plaintiff, the Equity Grants are both unfair and a violation of the 2010 Plan. Like the Preferred Stock, the Equity Grants were given to Steel Holdings affiliates. The Equity Grants, together with the Preferred Stock, gave Steel Holdings and its affiliates majority voting control of the Company. Under the first prong of *Aronson*, demand for Plaintiff's claim that the board breached their fiduciary duties in

43

approving the Equity Grants is excused. For the reasons stated above, four of the seven members of the board (Fejes, Howard, Kassan, and Lichtenstein) cannot impartially consider whether to pursue claims relating to the Equity Grants.

Another aspect of Plaintiff's claim concerning the Equity Grants implicates the second prong of *Aronson*. Plaintiff alleges the Director Defendants breached their fiduciary duties by approving and/or accepting the Equity Grants in knowing violation of the 2010 Plan. He cites *Pfeiffer v. Leedle*[123] and *Sanders v. Wang*[124] to argue the decision to award the Equity Grants in violation of the 2010 Plan was not the product of a valid exercise of business judgment. "The business judgment standard is not appropriate, and demand will be excused . . . when a plaintiff pleads particularized facts that indicate that the board knowingly or deliberately failed to adhere to the terms of a stock incentive plan."[125] "One way that a plaintiff can allege sufficiently a knowing and deliberate failure on the part of a board is by demonstrating that the alleged action was a clear and unambiguous violation of the company's stock incentive plan."[126] Defendants contend Plaintiff has not shown that

---

[123] 2013 WL 5988416 (Del. Ch. Nov. 8, 2013).

[124] 1999 WL 1044880 (Del. Ch. Nov. 8, 1999).

[125] *Pfeiffer*, 2013 WL 5988416, at *5.

[126] *Id.*

the board violated an unambiguous provision, or that the violation was knowing or deliberate.

Plaintiff believes the Equity Grants violated the 2010 Plan because they exceeded the number of Full Value Awards the 2010 Plan permitted. The issue turns on an interpretation of Section 3.1 of the 2010 Plan. For ease of reference, it is reproduced again, with emphases added:

> (a) Subject to Section 13.2 and Section 3.1(b), the aggregate number of Shares which may be issued or transferred pursuant to Awards under the Plan is *(i) 5,000,000 plus (ii) any Shares which are subject to awards under the Prior Plans which after the Effective Date are forfeited or lapse unexercised or are settled in cash and are not issued under the Prior Plans; provided, that* subject to Section 13.2 and, with respect to Full Value Awards that terminate, expire or lapse or for which shares of Common Stock are tendered or withheld, Section 3.1(b) *the aggregate number of shares of Common stock which may be issued or transferred pursuant to Full Value Awards under the Plan is 3,000,000*. No more than 5,000,000 Shares may be issued upon the exercise of Incentive Stock Options. After the Effective Date, no awards may be granted under any Prior Plan, however, any awards under any Prior Plan that are outstanding as of the Effective Date shall continue to be subject to the terms and conditions of such Prior Plan.

Plaintiff reads the provision as imposing a hard limit of 3,000,000 on all Full Value Awards. Under Plaintiff's reading, the Company violates the Plan if it awards more than 3,000,000 Full Value Awards without seeking stockholder approval. Defendants read the provision as limiting only a subset of the Full Value Awards: the Recycled Awards.

Based on these competing interpretations alone, it would be difficult to excuse demand because the Company's Compensation Committee had the authority to interpret the Plan.[127] The problem for defendants is that the Company agreed with Plaintiff's reading of Section 3.1 in a previous proxy. When stockholders approved the 2010 Plan, the proxy they received stated, "The Plan provides that no more than 3,000,000 shares will be granted as 'full value awards.'"[128] Nothing in the 2010 Proxy hints that the 3,000,000 limit on Full Value Awards is limited to Recycled Awards.

In arguing that they did not violate an unambiguous compensation plan provision, the Director Defendants attempt to disavow the disclosures in the 2010 Proxy because they were not on the board at that time. Under defendants' argument, the 2010 Proxy is irrelevant to whether the 2010 Plan is ambiguous and whether the directors violated it.

Delaware law does not support ignoring previous disclosures. In both *Friedman v. Khosrowshahi*[129] and *Sanders*, this Court looked to the company's disclosures about the compensation plan, or lack thereof, to determine whether the

---

[127] ModusLink Glob. Solutions, Inc., Definitive Proxy Statement (Schedule 14A) Appendix I § 12.2 (Oct. 26, 2010).

[128] *Id*. at 12.

[129] 2014 WL 3519188 (Del. Ch. July 16, 2014), *aff'd*, 2015 WL 1001009 (Del. Mar. 6, 2015).

directors had knowingly violated the governing plan. In *Friedman*, the company's interpretation of the plan was "consistent with disclosures contained in the Company's 2013 proxy statement" concerning a previous compensation committee decision.[130] In *Sanders*, then-Vice Chancellor Steele rejected an argument that the awards "carrie[d] out the 'fundamental and unambiguous' intent" of awarding stock at certain performance levels because

> [t]he defendants admit[ted] that they never explained this 'unambiguous' intent to shareholders when seeking approval for the Plan. Further, nothing in the documents I have reviewed shows that this was the case, though it seems it would have been simple enough for the Plan's proponents to describe this "fundamental" feature of the Plan, either in the text of the Plan itself, or, at minimum, in the proxy materials.[131]

Both cases support looking to the company's previous disclosures about its compensation plan to evaluate a board's decision about the plan's meaning.

Here, the Company told stockholders in 2010 that the 2010 Plan limited Full Value Awards to three million. But in 2017, the Company awarded more than three million Full Value Awards outright. This constitutes a violation of the 2010 Plan as described in the Company's clear and unambiguous previous disclosures, meaning Plaintiff has adequately pled that the board knowingly or deliberately failed to adhere to the terms of the 2010 Plan. Demand is thus excused.

---

[130] *Id.*

[131] *Sanders*, 1999 WL 1044880, at *8.

47

**E. Plaintiff Has Adequately Pled A Derivative Claim Against The Special Committee Defendants With Regard To The Equity Grants, But Not With Regard To The Preferred Stock.**

The Company's certificate of incorporation contains an exculpatory provision as authorized by 8 *Del. C.* § 102(b)(7).[132] Under *In re Cornerstone Therapeutics Inc. Shareholder Litigation*, "plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the suit."[133] This "rule applies regardless of the underlying standard of review for the transaction."[134] Just because "a plaintiff is able to plead facts supporting the application of the entire fairness standard to the transaction, and can thus state a duty of loyalty claim against the interested fiduciaries" does not mean the plaintiff states a claim against a non-interested fiduciary.[135] A "plaintiff must well-plead a loyalty breach against each individual director; so-called 'group pleading' will not suffice."[136]

Plaintiff does not adequately plead a non-exculpated claim against the Special Committee Defendants as to the Preferred Stock. Plaintiff does not allege that they received any unique benefit from the Preferred Stock. As discussed earlier, Plaintiff

---

[132] D.I. 28 Ex. 1, art. EIGHTH.

[133] 115 A.3d 1173, 1180 (Del. 2015).

[134] *Id*. at 1179.

[135] *Id*. at 1180.

[136] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018).

48

has not pled that the Special Committee Defendants lack independence, even for transactions with a controlling stockholder.[137] There are no non-conclusory allegations of bad faith.[138] And Plaintiff has not pled the "extreme factual scenario" to state a claim for waste.[139] Accordingly, the Special Committee Defendants are entitled to dismissal as to claims that they breached their fiduciary duties in approving the Preferred Stock.[140]

---

[137] The inverse is true for Kassan, who moved to dismiss on the basis that he is exculpated because he was "not alleged to have any current ties to Steel Holdings or its subsidiaries and affiliates apart from his seat on the Company Board." D.I. 28 at 35. As explained above, Kassan is not disinterested or independent concerning the Challenged Transactions and cannot impartially consider a demand. He therefore faces an adequately pled duty of loyalty claim. *See In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *22 (Del. Ch. Mar. 19, 2018) (concluding that directors lacked independence with respect to decision for same reasons they lacked "independence for demand-futility purposes"); *Cumming v. Edens*, 2018 WL 992877, at *25 (Del. Ch. Feb. 20, 2018) (ruling directors that were in "conflicted state" in approving challenged transactions could not consider demand meaning the "breach of loyalty claims cannot be extinguished at the pleading stage under Section 102(b)(7)"); *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *14 (Del. Ch. Oct. 28, 2013) ("A director will be considered conflicted with respect to a board decision if (i) the director stands to receive a benefit that is not shared by the corporation's stockholders as a whole, or (ii) the director is controlled by or beholden to another party. This is coextensive with the test for interestedness and lack of independence under the first prong of *Aronson*.").

[138] Plaintiff's bad faith allegations boil down to the accusation that the Challenged Transactions were "drastically unfair." D.I. 50 at 33.

[139] *Feuer*, 2018 WL 1870074, at *10. Though Plaintiff complains the Special Committee should have bargained for better terms, the Challenged Transactions are not so "egregious or irrational that [they] could not have been based on a valid assessment" of the best interests of the Company. *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001).

[140] Plaintiff argues he seeks equitable and non-monetary relief that allows it to bypass the exculpatory clause. But he does not explain why that relief would run to the Special Committee Directors, or why they must be parties for the Court to award the requested relief.

49

The Equity Grants are different. "Knowing or deliberate violations of a stockholder approved stock plan implicate the duty of loyalty, and breaches of the duty of loyalty cannot be exculpated[.]"[141] "Therefore, because demand is excused under the second prong of *Aronson* due to conduct that conceivably cannot be exculpated," Plaintiff has adequately pled a non-exculpated claim regarding the Equity Grants against the Special Committee Defendants.[142] In a world without the 2010 Plan, the Special Committee Defendants would be exculpated from the claim that they breached their fiduciary duties merely by approving the Equity Grants, as they were with the Preferred Stock. But Plaintiff has pled the non-exculpated claim that the Special Committee Defendants knowingly approved the Equity Grants in violation of the 2010 Plan, preventing dismissal.

### F. Plaintiff's Aiding And Abetting Claims Are Dismissed.

Plaintiff pleads that the Entity Defendants aided and abetted the alleged breaches of fiduciary duties. The elements of an aiding and abetting a breach of fiduciary duty claim are "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach."[143] "Prior decisions of this court

---

[141] *Pfeiffer*, 2013 WL 5988416, at *9.

[142] *Id.*

[143] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015).

50

have validated the unsurprising proposition that an aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself."[144] Count III, the direct aiding and abetting claim, is therefore dismissed.

The Entity Defendants also moved to dismiss Count IV, Plaintiff's derivative aiding and abetting claim, based on supposed shortcomings in Plaintiff's pleading.[145] Plaintiff did not address aiding and abetting at all in his brief or at argument. By failing to respond, Plaintiff abandoned this claim.[146] It is dismissed.

### G. Plaintiff States Claims Under Rule 12(b)(6).

Having established that Steel Holdings was a controlling stockholder, that Plaintiff's claims are derivative, and that demand is excused, I turn to whether Plaintiff's remaining claims may proceed under Court of Chancery Rule 12(b)(6).

---

[144] *Feldman*, 956 A.2d at 662; *see also In re Alloy, Inc.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.").

[145] D.I. 28 at 45-47.

[146] *See, e.g.*, *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *16 (Del. Ch. May 10, 2018) (ruling plaintiff's failure to respond to arguments raised in support of motion to dismiss meant it "abandoned every claim" not addressed); *Capano v. Capano*, 2014 WL 2964071, at *16 (Del. Ch. June 30, 2014) ("Defendants argue that the Court lacks jurisdiction to grant Joseph punitive damages and that some of Joseph's claims are derivative claims which he cannot assert after the Merger. Joseph did not respond to these arguments in his answering briefs or at oral argument and thus he has abandoned those claims."); *see also Emerald Pr's v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

### 1. Plaintiff's Claims Pertaining To The Preferred Stock May Proceed Under The Entire Fairness Standard.

"Delaware courts examine the merits of a claim for breach of fiduciary duty through one of (primarily) three doctrinal standards of review: business judgment, enhanced scrutiny, and entire fairness."[147] The business judgment rule is the default standard of review. It presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[148] When the business judgment rule applies, the result is usually dismissal.

Entire fairness, on the other hand, is "Delaware's most onerous standard, [and] applies when the board labors under actual conflicts of interest."[149] "A primary focus of our corporate jurisprudence has been ensuring that controlling stockholders do not use the corporate machinery to unfairly advantage themselves at the expense of the minority."[150] Yet "controlling stockholders are not automatically subject to entire fairness review when a controlled corporation effectuates a transaction.

---

[147] *Calma*, 114 A.3d at 577.

[148] *Aronson,* 473 A.2d at 812.

[149] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).

[150] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1039 (Del. Ch. 2012).

Rather, the controller also must engage in a conflicted transaction for entire fairness to apply."[151]

"Conflicted transactions come in many forms."[152] The issue often arises in relation to mergers or acquisitions, but our "courts also have applied [the entire fairness framework] more broadly to transactions in which a controller extracts a non-ratable benefit."[153]

"The disposition of defendants' motion to dismiss this claim under Rule 12(b)(6) turns on what standard of review applies to the claim."[154] "The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."[155]

Here, the conflict and non-ratable benefit from the Preferred Stock are clear. Steel Holdings was the Company's controlling stockholder. It stood on both sides

---

[151] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) (quoting *Crimson*, 2014 WL 5449419, at *12).

[152] *Id.*

[153] *EZCORP*, 2016 WL 301245, at *11.

[154] *Klein*, 2018 WL 6719717, at *14.

[155] *Hamilton P'rs*, 2014 WL 1813340, at *12.

of the Preferred Stock transaction. Plaintiff pleads the Preferred Stock had terms favorable to Steel Holdings at the Company's expense, including its dividend, and alleges the $1.96 conversion price was set too low, particularly in light of the expected price bump from announcing the IWCO acquisition. Plaintiff compares the financing terms to alternative sources of funding, including other portions of the financing the Company secured to fund the IWCO acquisition. And Plaintiff attacks the process by which the Special Committee tested the terms and other available options.

As pled, the Preferred Stock transaction was thus conflicted and gave Steel Holdings and its affiliates a non-ratable benefit. Entire fairness applies, and the Steel Holdings Defendants have failed to show that the transaction was entirely fair. Plaintiff's breach of fiduciary duty claim regarding the Preferred Stock survives dismissal under Rule 12(b)(6).

### 2. Plaintiff Has Adequately Pled A Breach Of Fiduciary Duty Concerning The Equity Grants.

Like the Preferred Stock, the Equity Grants benefitted Steel Holdings affiliates. And as with the Preferred Stock, Plaintiff alleges an improper benefit from the expected stock bump from the IWCO acquisition: because the Equity Grants were set at the current trading price of $1.49, their value "ballooned" by more than

40% when the Company announced the IWCO acquisition.[156] Plaintiff also alleges the size of the Equity Grants was "grossly unfair," particularly compared to awards given to the Company's other directors and officers, and by the Company's peers.[157] Plaintiff adds the Equity Grants to the Preferred Stock and concludes Steel Holdings and its affiliates received $48.7 million worth of stock for only $35 million.[158] Those underpriced shares represented approximately 17% of the Company's outstanding shares. By acquiring them, Steel Holdings obtained a majority of the Company's outstanding stock. For the reasons explained in connection with the Preferred Stock, Plaintiff's claim that the board breached its fiduciary duties in approving the Equity Grants survives dismissal and proceeds under the entire fairness standard.

In addition to that entire fairness analysis, and as explained above in finding demand was futile, Plaintiff has pled that the board knowingly violated the 2010 Plan in approving the Equity Grants. Because the standard under Rule 12(b)(6) is less stringent than under Rule 23.1, "where plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson*, that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to

---

[156] Compl. ¶¶ 75, 77.

[157] *Id*. ¶¶ 82-86.

[158] This number accounts for only the vested portion of the Equity Grants. Including all of the Equity Grants increases the value to over $51 million.

dismiss pursuant to Rule 12(b)(6)."[159]  Plaintiff has pled that demand for a claim

relating to violating the 2010 Plan is futile under *Aronson*'s second prong.  The claim

therefore also survives the 12(b)(6) motion.

### 3. Plaintiff Has Adequately Pled An Unjust Enrichment Claim.

Plaintiff's unjust enrichment claim is brought against Steel Holdings, SPH,

Lichtenstein, Fejes, and Howard.  Plaintiff alleges the same "grossly unfair" terms

of the Preferred Stock and "unauthorized financial benefits" from the Equity Grants,

as its breach of fiduciary duty claims.[160]  I therefore reach the same conclusion as I

did for the breach of fiduciary duty claim:  Plaintiff's unjust enrichment claim is

derivative under *Tooley*.[161]

"To state a claim, the complaint must allege sufficient facts plausibly to show:

(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and

impoverishment, (4) the absence of justification, and (5) the absence of a remedy

---

[159] *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007).

[160] Compl. ¶¶ 187-88.

[161] *See Reiter v. Fairbank*, 2016 WL 6081823, at *14 (Del. Ch. Oct. 18, 2016) (dismissing derivative breach of fiduciary duty and unjust enrichment claims under Rule 23.1); *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *9 (Del. Ch. Dec. 20, 2012) (classifying unjust enrichment claim as derivative and dismissing along with breach of fiduciary duty claim); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *23-24 (Del. Ch. May 5, 2010) (ruling unjust enrichment claim was derivative and dismissing for failure to make demand).

provided by law."[162]  The Entity Defendants argue "[i]t is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim."[163]  The Entity Defendants invoke this principle because a Preferred Stock Purchase Agreement governs the Company's sale of the Preferred Stock.  "But when a plaintiff alleges that 'it is the [contract], itself, that is the unjust enrichment,' the existence of the contract does not bar the unjust enrichment claim."[164]  Defendants contend this angle "only works if Plaintiff's underlying fiduciary duty claims have any merit, which they do not."[165]  For the reasons explained above, defendants are wrong about the merit of Plaintiff's underlying claim.  And though defendants argue an unjust enrichment claim usually fails along with a fiduciary duty claim,[166] the two claims can also survive together.[167]

---

[162] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010).  Plaintiff cited only Delaware law in support of his unjust enrichment claim and I therefore assume Delaware law governs this claim.

[163] D.I. 28 at 48 (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012)).

[164] *RCS Cred. Tr. v. Schorsch*, 2018 WL 1640169, at *7 (Del. Ch. Apr. 5, 2018) (alteration in original) (quoting *McPadden*, 964 A.2d at 1276).

[165] D.I. 58 at 32-33.

[166] *Id*. at 33-34.

[167] *See Calma*, 2015 WL 1951930, at *20 (viewing unjust enrichment as duplicative of breach of fiduciary duty claim where plaintiff alleged no "unjust enrichment separate or distinct from the alleged breach of fiduciary duty" and concluding that because party adequately pled breach of fiduciary duty it was reasonably conceivable the plaintiff could recover for unjust enrichment); *Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch.

Some clarity as to the proper defendants is needed. Plaintiff did not specify how different defendants were unjustly enriched. Defendants correctly identify that Plaintiff fails to plead an enrichment by all identified parties for both the Preferred Stock and the Equity Grants. Plaintiff did not allege or argue that Fejes, Howard, or Lichtenstein benefited at all from the Preferred Stock. Thus, the Preferred Stock portion of the claim is dismissed as to Fejes, Howard, and Lichtenstein.

Steel Holdings and SPH assert Plaintiff has failed to plead they were unjustly enriched by the Equity Grants. The amounts of the Equity Grants are included in Steel Holdings' 13(d) ownership, with Fejes, Howard, or Lichtenstein retaining sole beneficial ownership over those shares.[168] Plaintiff's theory that giving the Equity Grants to its affiliated directors gave Steel Holdings majority voting control over the Company runs throughout Plaintiff's case.[169] That theory survived the motion to dismiss Plaintiff's breach of fiduciary duty claim, and survives on unjust enrichment

---

Mar. 30, 2012) ("A plaintiff will only receive, at most, one recovery, but, at least at this procedural juncture, [it] may simultaneously assert a claim for breach of fiduciary duty and a claim for unjust enrichment."); *MCG Capital Corp.*, 2010 WL 1782271, at *25 n.147 ("In this case, then, for all practical purposes, the claims for breach of fiduciary duty and unjust enrichment are redundant. One can imagine, however, factual circumstances in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical, so there is no bar to bringing both claims against a director.").

[168] Ex. 14 at 9, 11, 12 (showing these individuals have sole voting power and sole dispositive power over number of shares they beneficially own); *id*. at 13 (stating each individual "disclaim[ed] beneficial ownership of the Shares owned directly by another Reporting Person, except to the extent of his or its pecuniary interest therein.").

[169] Compl. ¶ 187.

as well. But Plaintiff alleges no connection between SPH and the Equity Grants, other than SPH's affiliation with Steel Holdings. The Equity Grant portion of Count VI is dismissed only as to SPH.

### 4. Plaintiff Stated A Disclosure Claim.

While Plaintiff's direct breach of fiduciary duty claim seeking to rescind the Challenged Transactions was dismissed in favor of his derivative claim, Count I also alleges a claim of the breach of the duty of candor against the Director Defendants for disclosure violations in the Company's 2017 Proxy. A board's obligation to fully and fairly disclose all material information "attaches to proxy statements and any other disclosures in contemplation of shareholder action."[170] "When directors speak out about their own compensation, or that of company managers, shareholders have a right to the full, unvarnished truth."[171] Thus, where stockholder approval of a plan of compensation is involved, the "disclosure or fair summary of all of the relevant terms and conditions of the proposed plan of compensation, together with any material extrinsic fact within the board's knowledge bearing on the issue," is required.[172]

---

[170] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

[171] *In re Tyson Foods, Inc.*, 2007 WL 2351071, at *4 n.18 (Del. Ch. Aug. 15, 2007).

[172] *Lewis v. Vogelstein*, 699 A.2d 327, 333 (Del. Ch. 1997).

In Proposal No. 7 in the 2017 Proxy, the Company sought stockholder approval to amend the Plan to permit the Equity Grants.[173] The Plan was to be amended to increase the number of shares available for issuance and to eliminate the limit on the number of "Full Value Awards" that can be issued under the Plan. Plaintiff alleges a number of alleged disclosure deficiencies, including:

(1)     the Company did not disclose the full number of Equity Grants;

(2)     the Company did not disclose the existing limit, of three million Full Value Awards, that it sought to eliminate;

(3)     the Company affirmatively misrepresented the existing three million limit for Full Value Awards by stating the limit applied only to shares that were originally issued under the Company's compensation plans prior to the Plan and were forfeited, lapsed, or settled in cash after the effective date of the Plan and were recycled for use under the Plan;

(4)     the Company had given the Equity Grants but there were insufficient shares available under the Plan to cover them; and

(5)     the Company breached the Plan, and ran out of shares under the 2010 Plan because the Company used almost all of the shares for the Equity Grants.

These allegations turn on the interpretation of Section 3.1 of the 2010 Plan discussed above.

In the 2017 Proxy, stockholders were asked whether to "increase the shares available under the 2010 Plan in an amount sufficient to permit" awards listed for

---

[173] D.I. 28 Ex. 15 at 37.

Lichtenstein, Fejes, and Howard.[174] But that only covered 1,050,000 of the 5,500,000 million shares[175] covered by the Equity Grants. Under Plaintiff's interpretation of Section 3.1, which the Company adopted in the 2010 Proxy, the difference between the remaining Equity Grants and the three million cap also required approval. Stockholders were not told that. And because the Company did not include the full number of Equity Grants awarded, a stockholder could not do the math for herself to understand what she was being asked to approve.

Plaintiff also alleges the 2017 Proxy does not disclose that the board granted Lichtenstein, Howard, and Fejes more Full Value Award shares than the 2010 Plan allowed. Instead, Plaintiff alleges, the board affirmatively misrepresented the three million limit by stating it applied only to Recycled Shares. Furthermore, the 2017 Proxy did not mention the 2010 Proxy's disclosure that all Full Value Awards were capped at three million. Finally, Plaintiff asserts the 2017 Proxy did not disclose why the Company had run out of shares. According to Plaintiff, the Company exceeded the 2010 Plan's original limit of five million shares because the board used 83.9% of the available shares to issue the Equity Grants.[176]

---

[174] D.I. 28 Ex. 15 at 46.

[175] The grants were both "Stock Payments" and "Restricted Stock." The reference to "shares" is an attempt to simplify the discussion here.

[176] Plaintiff calculates this based on the number of shares available as of July 31, 2017. Compl. ¶ 116.

It is reasonably conceivable that a stockholder considering whether to approve those amendments would want to know (a) that the Company previously believed the 2010 Plan limited Full Value Awards at three million shares; and (b) the size of the Equity Grants relative to that limit. Plaintiff's disclosure claim survives dismissal.

## III.    CONCLUSION

For the foregoing reasons, the motions to dismiss filed by the Steel Holdings Defendants and the Special Committee Defendants are GRANTED IN PART and DENIED IN PART. Count I is dismissed, with the exception of the direct disclosure claim as against all the Director Defendants. Count II is dismissed as against the Special Committee Defendants with regard to the Preferred Stock, but may proceed against them with regard to the Equity Grants, and may also proceed against the other Director Defendants with regard to the Preferred Stock and Equity Grants. Counts III and IV, for aiding and abetting, are dismissed. Count V may proceed as a derivative claim against Steel Holdings. Count VI, for unjust enrichment, is dismissed as against SPH with regard to the Equity Grants, and is dismissed as against Lichtenstein, Fejes, and Howard with regard to the Preferred Stock. Steel Holdings' motion is denied with regard to Count VI.

**IT IS SO ORDERED.**